IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| CHAD K., <br><br> Plaintiff, <br><br> v. <br><br> ANDREW M. SAUL, Commissioner of Social Security, <br><br> Defendant. | MEMORANDUM DECISION AND ORDER <br><br><br> Case No. 4:19-cv-00053-PK <br><br> Magistrate Judge Paul Kohler |

This matter comes before the Court on Plaintiff Chad K.'s appeal of the decision of the Social Security Administration denying his application for disability and disability insurance benefits. The Court held oral arguments on April 29, 2020. Having considered the arguments of the parties, reviewed the record and relevant case law, and being otherwise informed, the Court will affirm the administrative ruling.

## I.  STANDARD OF REVIEW

This Court's review of the administrative law judge's ("ALJ") decision is limited to determining whether his findings are supported by substantial evidence and whether the correct legal standards were applied.[1] "Substantial evidence 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"[2] The ALJ is required to consider all of the evidence, although he or she is not required to discuss all of the evidence.[3] If

---

[1] *Rutledge v. Apfel*, 230 F.3d 1172, 1174 (10th Cir. 2000).

[2] *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

[3] *Id.* at 1009–10.

supported by substantial evidence, the Commissioner's findings are conclusive and must be affirmed.[4]  The Court should evaluate the record as a whole, including the evidence before the ALJ that detracts from the weight of the ALJ's decision.[5]  However, the reviewing court should not re-weigh the evidence or substitute its judgment for that of the Commissioner.[6]

## II.  BACKGROUND

A.   PROCEDURAL HISTORY

On April 22, 2015, Plaintiff filed an application for disability insurance benefits, alleging disability beginning on October 16, 2014.[7]  The claim was denied initially and upon reconsideration.[8]  Plaintiff then requested a hearing before an ALJ, which was held on August 10, 2017.[9]  The ALJ issued a decision on November 8, 2017.[10]  The Appeals Council remanded the matter on October 9, 2018.[11]  A remand hearing was held on January 15, 2019.[12]  The ALJ issued a decision on April 1, 2019, finding Plaintiff not disabled.[13]  The Appeals Council denied

---

[4] *Richardson*, 402 U.S. at 390.

[5] *Shepherd v. Apfel*, 184 F.3d 1196, 1199 (10th Cir. 1999).

[6] *Qualls v. Apfel*, 206 F.3d 1368, 1371 (10th Cir. 2000).

[7] R. at 262–68.

[8] *Id.* at 71, 85.

[9] *Id.* at 48–70.

[10] *Id.* at 102–19.

[11] *Id.* at 120–24.

[12] *Id.* at 34–47.

[13] *Id.* at 9–33.

Plaintiff's request for review on June 24, 2019,[14] making the ALJ's decision the Commissioner's final decision for purposes of judicial review.[15]

On July 26, 2019, Plaintiff filed his Complaint in this case.[16]  The Commissioner filed his Answer and the administrative record on October 9, 2019.[17]  On October 15, 2019, both parties consented to a United States Magistrate Judge conducting all proceedings in the case, including entry of final judgment, with appeal to the United States Court of Appeals for the Tenth Circuit.[18]

Plaintiff filed his Opening Brief on November 22, 2019.[19]  Defendant filed his Answer Brief on March 4, 2020.[20]  Plaintiff filed his Reply Brief on March 18, 2020.

B.      MEDICAL HISTORY

Plaintiff alleges disability based on his back pain and mental health issues.

1.      *Back Pain*

---

[14] *Id.* at 1–6.

[15] 20 C.F.R. § 422.210(a).

[16] Docket No. 3.

[17] Docket Nos. 7, 8.

[18] Docket No. 11.

[19] Docket No. 15.

[20] Docket No. 21.

Plaintiff was seen at Southwest Spine & Pain Care Specialists on October 28, 2013.[21]  At that time, his pain was moderately controlled with pain medication.[22]  He reported that he scheduled a surgical consultation with Jason Garber, M.D.[23]

On November 5, 2013, Plaintiff presented to Dr. Garber with a complaint of axial mechanical back pain, which he had for approximately 20 years.[24]  An MRI of the lumbar spine revealed moderate to severe disc degeneration at L4-5 and L5-S1 with associated annular tears.[25]  Dr. Garber presented two options:  a dorsal column simulator trial or order x-rays and discography to determine if there was a structural problem that might require surgery.[26]

Plaintiff again presented to Southwest Spine & Care Specialists on November 27, 2013.  Plaintiff reported that his pain was moderately controlled with pain medication and he was advised to continue using conservative treatment measures.[27]  Plaintiff returned to Southwest Spine & Care Specialists in December 2013, January 2014, and February 2014.  On February 19, 2014, Plaintiff received an injection.[28]

At a follow-up visit with Dr. Garber in March 2014, Dr. Garber noted that the discography showed severe disc degeneration and severe bilateral neuroforaminal narrowing.[29]

---

[21] R. at 498–99.

[22] *Id.* at 498.

[23] *Id.*

[24] *Id.* at 427.

[25] *Id.* at 428.

[26] *Id.*

[27] *Id.* at 495–97.

[28] *Id.* at 485.

[29] *Id.* at 429.

Dr. Garber recommended an anterior-posterior lumbar spine reconstruction from L4 to S1 since conservative treatment had failed.[30]

In May 2014, Plaintiff saw Benjamin Fox, M.D., for a second opinion.  Dr. Fox stated that he would not offer Plaintiff a fusion procedure without further evidence of potential success.[31]  Instead, he recommended an EMG to evaluate for radiculopathy and to consider a spinal cord simulator trial.[32]

Plaintiff continued to receive treatment at Southwest Spine & Care Specialists.  On September 11, 2014, he received a sacroiliac joint injection.[33]  On September 22, 2014, Plaintiff reported that his pain was well controlled by his treatment and medications.[34]  By November, he reported that his pain was only moderately controlled.[35]  Plaintiff received another sacroiliac joint injection in December 2014, after reporting worsening pain.[36]

In January 2015, Plaintiff saw his treating physician Gregory G. Last, M.D., for pain.[37] Dr. Last prescribed hydrocodone with ibuprofen.[38]

---

[30] *Id.*

[31] *Id.* at 439.

[32] *Id.*

[33] *Id.* at 464.

[34] *Id.* at 461.

[35] *Id.* at 458.

[36] *Id.* at 453, 455.

[37] *Id.* at 582.

[38] *Id.*

On February 20, 2015, Plaintiff presented with worsening back pain.[39]  Plaintiff was diagnosed with sacroiliac joint pain and a sacroiliac joint injection was recommended.[40]  An injection was given on February 24, 2015.[41]

Plaintiff again saw Dr. Last for pain on March 19, 2015.[42]  Dr. Last refilled Plaintiff's prescription for hydrocodone with ibuprofen.[43]  On September 22, 2015, Dr. Last noted that he had been treating Plaintiff for back pain for the past ten years.[44]  Dr. Last noted that Plaintiff's pain had not gotten better or worse during this time and prescribed hydrocodone with ibuprofen.[45]

Plaintiff returned to see Dr. Last on December 17, 2015.[46]  Plaintiff told Dr. Last that he could do basic cleaning around the house and take care of his child.[47]  Dr. Last refilled Plaintiff's pain medication, noting that all other treatment options had been exhausted.[48]

Plaintiff again saw Dr. Last on March 21, 2016.  Dr. Last noted that Plaintiff's current medications were working for him.[49]  In June 2016, Dr. Last similarly stated that Plaintiff's pain

---

[39] *Id.* at 447.

[40] *Id.* at 449.

[41] *Id.* at 446.

[42] *Id.* at 573.

[43] *Id.*

[44] *Id.* at 694–95.

[45] *Id.*

[46] *Id.* at 691.

[47] *Id.*

[48] *Id.* at 692.

[49] *Id.* at 686.

medication "works well for his lower back pain."[50]  On November 21, 2016, Dr. Last refilled Plaintiff's pain medication and stated that Plaintiff was "doing about the same as usual."[51]  Dr. Last noted that Plaintiff takes care of his daughter and does housework.[52]  On March 1, 2017, Dr. Last similarly noted that plaintiff's pain was about the same, that he was a stay-at-home dad, and that he was "functioning at home."[53]

On June 1, 2017, Dr. Last again noted that Plaintiff was able to take care of his daughter and do basic housework.[54]  Plaintiff reported that sometimes his pain was so severe that all he can do is lie on the couch.[55]  However, he stated that he can usually do the things he needs to do.[56]

In July 2017, an MRI of the lumbar spine was completed.  It showed minimal anterolisthesis of the L4 on L5; minimal facet joint arthropathy at L3-L4; minimal disc space narrowing at L4-L5 with facet join arthropathy and ligamentum flavum hypertrophic change, and a minimal disc bulge contacting the L4 nerves; and a small annular fissure at L5-S1.[57]

Plaintiff again met with Dr. Fox in November 2017.  Dr. Fox recommended a multilevel lumbar disc replacement at L4-5 and L5-S1.[58]

---

[50] *Id.* at 680.

[51] *Id.* at 744.

[52] *Id.*

[53] *Id.* at 837.

[54] *Id.* at 713.

[55] *Id.* at 714.

[56] *Id.*

[57] *Id.* at 799–800.

[58] *Id.*

On December 6, 2017, Plaintiff presented to Dr. Last for a refill of his pain medications.[59]  Dr. Last noted that Plaintiff had been on the same pain medication for four years and was "functioning fairly well."[60]

On December 7, 2017, Plaintiff met with Mark H. Stouffer, M.D.  Dr. Stouffer informed Plaintiff that even if he underwent back surgery, he would not be completely pain free.[61]  Dr. Stouffer noted that since Plaintiff's symptoms were not to the point of limiting his quality of life, he recommended Plaintiff continue with conservative care efforts.[62]

Plaintiff has also received chiropractic care to try to alleviate his pain.[63]  Plaintiff's chiropractor, Joshua A. Carr, D.C., completed a Treating Source Statement of Physical Limitations.[64]  Dr. Carr indicated that he had treated Plaintiff intermittently since 2006.[65]  Dr. Carr opined that Plaintiff would be off task 20% or more in an average work day and would miss 4 or more days per month because of his impairments.[66]

---

[59] *Id.* at 819.

[60] *Id.*

[61] *Id.* at 846.

[62] *Id.*

[63] *Id.* at 506–19, 699–704, 938–57.

[64] *Id.* at 671–72.

[65] *Id.* at 671.

[66] *Id.*

2.    *Mental Health*

Plaintiff presented to his treating physician, Dr. Last, with anxiety on February 5, 2013.[67] Plaintiff was started on Risperdal.[68]  Plaintiff saw Dr. Last again in July 2013, and he stated that the Risperdal did not work.[69]  Plaintiff was started on Seroquel.[70]  Plaintiff again presented to Dr. Last for anxiety on October 8, 2013, and he was started on BuSpar.[71]

Plaintiff began treatment at Southern Utah Behavioral Health in October 2013.[72] Plaintiff was diagnosed with dysthymic disorder and generalized anxiety.[73]  Plaintiff continued to be seen periodically.

On December 11, 2013, Plaintiff reported to Dr. Last that he was doing well.[74]

On July 2, 2014, Plaintiff was seen by Stephen A. Welsh, M.D., for insomnia related to his anxiety and depression.[75]  Dr. Welsh prescribed trazadone and recommended Plaintiff see a psychiatrist.[76]  Plaintiff was seen by Dr. Last on October 2, 2014, and was re-prescribed Seroquel.[77]

---

[67] *Id.* at 616.

[68] *Id.*

[69] *Id.* at 604.

[70] *Id.*

[71] *Id.* at 600.

[72] *Id.* at 553.

[73] *Id.* at 556.

[74] *Id.* at 597.

[75] *Id.* at 589–90.

[76] *Id.*

[77] *Id.* at 588.

Plaintiff saw Sheldon Moon, M.D., for a second opinion of medication for anxiety on October 16, 2014.[78]  Dr. Moon prescribed Lyrica.[79]  Plaintiff returned to Dr. Last in January 2015, where he was prescribed lithium.[80]

In February 2015, Plaintiff was seen by Ron B. Chamberlain, Ph.D. and Claude L. Parker, M.D.[81]  Dr. Chamberlain diagnosed general anxiety disorder and Plaintiff was started on imipramine.[82]  By February 18, 2015, Plaintiff stated that he could feel improvement with imipramine.[83]  Plaintiff similarly reported to Dr. Last that he was encouraged by how he was doing on imipramine.[84]

In April 2015, Plaintiff reported to Dr. Chamberlain that he felt like he was getting better and credited his medication for the improvement.[85]  He stated that his wife had noticed positive changes as well.[86]  On April 15, 2015, Plaintiff met with Dr. Parker.[87]  Plaintiff stated that he was feeling better, was less depressed, and was doing better in his social interactions.[88]  Plaintiff stated that he would like to work nights so that he could care for his child during the day.[89]

---

[78] *Id.* at 584–85.

[79] *Id.*

[80] *Id.* at 582.

[81] *Id.* at 539–40.

[82] *Id.* at 539, 546.

[83] *Id.* at 531.

[84] *Id.* at 573.

[85] *Id.* at 525.

[86] *Id.*

[87] *Id.* at 527.

[88] *Id.*

[89] *Id.*

Plaintiff was seen by Dr. Parker again on May 13, 2015.[90]  Plaintiff reported that he had responded well to imipramine, was less depressed, and was doing better in his social interactions.[91]   Plaintiff reported that he was able to attend social functions and was now a stay-at-home parent.[92]

Plaintiff reported to Dr. Last in March 2016, that he could go out shopping with his family, though he disliked doing so.[93]

Plaintiff saw Brian C. Nyberg, M.D., for a psychiatric evaluation on May 9, 2016.[94] Plaintiff reported chronic anxiety and depression.[95]  Dr. Nyberg adjusted Plaintiff's medications.[96]

Plaintiff began participating in therapy around this same time.  In a June 27, 2016 therapy session, Plaintiff reported that he recently went on a trip and that his anxiety was somewhat improved.[97]  By September 2016, Plaintiff stated that he was doing okay overall and no longer wanted to participate in therapy.[98]

---

[90] *Id.* at 522.

[91] *Id.*

[92] *Id.*

[93] *Id.* at 686.

[94] *Id.* at 778–83.

[95] *Id.*

[96] *Id.* at 782.

[97] *Id.* at 770.

[98] *Id.* at 759.

In November 2016, Plaintiff reported that his anxiety and depression were stable but that his social phobia had worsened.[99]  Plaintiff's medications were adjusted.[100]  On January 6, 2017, Plaintiff reported to Dr. Nyberg that he continued to experience depressed mood.[101]  In May 2017, Plaintiff reported worsened symptoms of depression.[102]

In September 2017, Plaintiff saw Victor Baumgarten, LCSW, to help with managing his anxiety and mood, cope with life circumstances, and pain issues.[103]  Plaintiff was diagnosed with obsessive compulsive disorder, bipolar disorder, major depressive disorder, and social phobia.[104]

C.    HEARING TESTIMONY

At the initial hearing before the ALJ, Plaintiff stated that he would try to alleviate his pain when he woke up.[105]  After that, he would do light housework.[106]  He stated that he could go shopping, do light cooking, and could be on his feet for an hour and a half.[107]  Plaintiff stated that he could sit for 15 minutes at a time without changing position.[108]  Plaintiff stated that he took pain medication, which helped 50% of the time.[109]  He noted that he tried other

---

[99] *Id.* at 748.

[100] *Id.*

[101] *Id.* at 740.

[102] *Id.* at 721.

[103] *Id.* at 843–45.

[104] *Id.* at 843.

[105] *Id.* at 56.

[106] *Id.*

[107] *Id.* at 56–58.

[108] *Id.* at 58.

[109] *Id.* at 61.

conservative measures without much success.[110]  He also testified that he went on vacation to South Dakota that year.[111]

Plaintiff further testified that his depression and anxiety made him not want to leave the house or socialize with anyone.[112]  Plaintiff stated that his mind was constantly running, and he thought he could read other people's thoughts.[113]

At the hearing on January 15, 2019, Plaintiff testified that he suffered from lower back pain.[114]  Plaintiff stated that he could stand or sit for between 30 minutes and an hour before he needed to change positions.[115]  Plaintiff did not think he could be on his feet or sit for six hours in an 8-hour day.[116]  He was taking pain medication for his back, which provided some relief.[117]

As to his mental impairments, Plaintiff stated he has depression and anxiety.[118]  Plaintiff did not take any medication for these conditions because of their side effects.[119]  Plaintiff stated that he was able to do work around the house, pick up his daughter from school, and take his daughter to school functions twice a month.[120]

---

[110] *Id.* at 69.

[111] *Id.* at 59.

[112] *Id.* at 66.

[113] *Id.*

[114] *Id.* at 38.

[115] *Id.*

[116] *Id.* at 39.

[117] *Id.*

[118] *Id.* at 40.

[119] *Id.*

[120] *Id.* at 40, 42.

D.      THE ALJ'S DECISION

The ALJ followed the five-step sequential evaluation process in deciding Plaintiff's claim.  At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity from his alleged onset date of October 16, 2014.[121]  At step two, the ALJ found that Plaintiff suffered from the following severe impairments:  degenerative disc disease, depression, and anxiety disorder.[122]  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment.[123]  The ALJ determined that Plaintiff had the residual functional capacity to perform light work, except he could only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, or scaffolds.[124]  The ALJ also concluded that Plaintiff could understand, remember, and carry out simple, routine, repetitive tasks.[125]  He could also tolerate no more than occasional interaction with co-workers, supervisors, and the general public, and could adapt to routine work changes in the work setting.[126]  At step four, the ALJ determined that Plaintiff could not perform his past relevant work.[127]  At step five, the ALJ found that Plaintiff could perform jobs that exist in significant numbers in the national economy and, therefore, was not disabled.[128]

---

[121] *Id.* at 14.

[122] *Id.* at 15.

[123] *Id.* at 15–17.

[124] *Id.* at 18–26.

[125] *Id.*

[126] *Id.*

[127] *Id.* at 26–27.

[128] *Id.* at 27–28.

## III. DISCUSSION

Plaintiff raises one issue in his brief: whether the ALJ erred in failing to properly address the medical opinion evidence.

An ALJ must review every medical opinion.[129] In reviewing the opinions of treating sources, the ALJ must engage in a sequential analysis.[130] First, the ALJ must consider whether the opinion is well-supported by medically acceptable clinical and laboratory techniques.[131] If the ALJ finds that the opinion is well-supported, then he must confirm that the opinion is consistent with other substantial evidence in the record.[132] If these conditions are not met, the treating physician's opinion is not entitled to controlling weight.[133]

This does not end the analysis, however. Even if a physician's opinion is not entitled to controlling weight, that opinion must still be evaluated using certain factors.[134] Those factors include:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.[135]

---

[129] 20 C.F.R. § 404.1527(c).

[130] *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).

[131] *Id.*

[132] *Id.*

[133] *Id.*

[134] *Id.*

[135] *Id.* at 1301 (quoting *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001)).

After considering these factors, the ALJ must give good reasons for the weight he ultimately assigns the opinion.[136]  If the ALJ rejects the opinion completely, he must give specific, legitimate reasons for doing so.[137]

A.      DR. LAST

Plaintiff's treating physician, Dr. Last, submitted two questionnaires that the ALJ considered.  The first Treating Source Statement of Physical Limitations was completed on August 26, 2015.[138]  Dr. Last opined that Plaintiff would be off task 20% or more of the time, would be absent four or more days per month, and would be 50% less efficient than the average worker.[139]

In June 2017, Dr. Last completed a second form.[140]  Dr. Last opined that Plaintiff would need to change body position every thirty minutes due to pain.[141]  Dr. Last opined that Plaintiff could not stand and/or walk for 6-8 hours on a long-term basis.[142]  He opined that Plaintiff could only stand and/or walk for 15 minutes in an 8-hour workday.[143]  Dr. Last further opined that Plaintiff would be off task 20% or more of the time, would be absent four or more days per month, and would be less than 50% as efficient as an average worker.[144]

---

[136] *Id.*

[137] *Id.*

[138] R. at 673–74.

[139] *Id.*

[140] *Id.* at 789–96.

[141] *Id.* at 791.

[142] *Id.* at 794.

[143] *Id.*

[144] *Id.* at 795.

The ALJ gave little weight to these questionnaires.  He concluded that they were not consistent with the objective and clinical findings in the record, including Dr. Last's own findings, but were instead based on Plaintiff's subjective reports.  The ALJ specifically pointed to a progress note from August 26, 2015—the same day Plaintiff requested Dr. Last complete the second questionnaire—where Dr. Last noted that he had previously encouraged Plaintiff to obtain a supervisory job.[145]  In that same progress note, it was reported that Plaintiff stated that he felt it might be possible for him to work a desk job so long as he could work on his own.[146]

Plaintiff first argues that the ALJ erred because he did not indicate whether he was according Dr. Last's opinions controlling weight.  While it is true that the ALJ did not specifically state that he was not giving Dr. Last's opinions controlling weight, it is implicit in his decision that he was not giving those opinions controlling weight.  Therefore, reversal is not required on this ground.[147]

Plaintiff further argues that the ALJ erred in giving Dr. Last's opinions little weight.  As stated, the ALJ gave Dr. Last's opinions little weight because they were not consistent with the record, including Dr. Last's findings, and were largely based on Plaintiff's subjective complaints.  These are good reasons, supported by substantial evidence, for the ALJ to afford little weight to Dr. Last's opinions.

---

[145] *Id.* at 697.

[146] *Id.*

[147] *Mays v. Colvin*, 739 F.3d 569, 575 (10th Cir. 2014) ("Because we can tell from the decision that the ALJ declined to give controlling weight to Dr. Chorley's opinion, we will not reverse on this ground.").

As discussed above, Dr. Last's treatment notes indicate that Plaintiff's pain was controlled with medication, he could perform housework, and could take care of his daughter. Imaging also revealed relatively mild findings and physical examinations were largely unremarkable.  Further, Plaintiff's back pain and mental health issues were treated with conservative measures.  This evidence stands in contrast to the extreme limitations contained in Dr. Last's two questionnaires.  Thus, the ALJ could properly give Dr. Last's opinions little weight.

B.    DR. NYBERG

Dr. Nyberg, Plaintiff's treating psychiatrist, provided a Treating Source Statement of Mental Limitations on June 12, 2017.[148]  Dr. Nyberg opined that Plaintiff had a number of marked limitations, including:  following one-or two-step oral instructions; recognizing a mistake and correcting it; sequencing multi-step activities; using reason and judgment to make work-related decisions; responding to requests, suggestions, criticism, correction, and challenges; keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness; initiating and performing a task that he understands and knows how to do; working at an appropriate and consistent pace; and sustaining an ordinary routine and regular attendance at work.[149]  Dr. Nyberg opined that Plaintiff had moderate limitations in:  understanding and responding to social cues; distinguishing between acceptable and unacceptable work performance; and maintaining personal hygiene appropriate to the work

---

[148] R. at 707–08.

[149] *Id.*

setting.[150]  Dr. Nyberg further opined that Plaintiff would be absent from work four or more days

per month and would be off task 20% or more of an 8-hour work day.[151]

The ALJ gave little weight to this questionnaire.[152]  The ALJ did so because the marked

limitations noted by Dr. Nyberg were not supported by the clinical evidence, including Dr.

Nyberg's treatment notes, and Plaintiff's reported activity.[153]  In support of this conclusion, the

ALJ pointed to the fact that Plaintiff had acted as a primary care giver for two small children

during the relevant period and had received only conservative psychological treatment.[154]

The ALJ provided good reasons, supported by substantial evidence, which support his

decision to afford little weight to Dr. Nyberg's opinions.  While Plaintiff has a history of

depression and anxiety, the record does not support the type of marked restrictions espoused by

Dr. Nyberg.  Plaintiff had tried several medications without success but appeared to do well on

imipramine, though he has since stopped taking any medications for his mental health

conditions.  Plaintiff briefly attended therapy, but discontinued treatment after reporting that he

was feeling okay.  In addition, Plaintiff was able to take care of his daughter and occasionally

attend social functions.  He was also able to do housework and take a vacation to see his family.

Plaintiff's prior work history also stands in contrast to the limitations expressed by Dr. Nyberg.

All of this supports the ALJ's decision to give little weight to Dr. Nyberg's opinions.

---

[150] *Id.* at 708.

[151] *Id.*

[152] *Id.* at 26.

[153] *Id.*

[154] *Id.*  While the ALJ stated that Plaintiff cared for two children, it appears he only has
one child.

C.     DR. GUPTA

The ALJ gave great weight to Deepa Gupta, M.D., a state agency medical consultant.  Dr. Gupta reviewed the medical records in September 2015 and concluded that Plaintiff could occasionally lift 20 pounds; frequently lift 10 pounds; sit, stand, or walk for about 6 hours in an 8-hour workday with normal breaks; frequently balance, but only occasionally climb ramps, stairs, ladders, ropes, and scaffolds; and occasionally, stoop, kneel, crouch, and crawl.[155]

The ALJ gave Dr. Gupta great weight because he had reviewed more medical evidence than the state agency physician on initial review.  The ALJ also noted that Dr. Gupta's opinions as to Plaintiff's exertional limitations were consistent with the medical evidence received into the record after Dr. Gupta issued his opinion.  This is consistent with guidance from the Social Security Administration, which states that, in certain circumstances, a state agency physician's opinions may be entitled to greater weight than those of a treating physician.[156]

> For example, the opinion of a State agency medical or psychological consultant or other program physician or psychologist may be entitled to greater weight than a treating source's medical opinion if the State agency medical or psychological consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.[157]

Here, the ALJ gave greater weight to Dr. Gupta's opinions because he had reviewed more medical evidence than the previous reviewer and his opinions were consistent with the medical evidence produced after Dr. Gupta made his assessment.  Plaintiff argues that since Dr. Gupta

---

[155] *Id.* at 95–96.

[156] SSR 96-6P, 1996 WL 374180, at *3 (July 2, 1996).

[157] *Id.*

issued his opinion, surgery was recommended by Dr. Fox.  It is true that after Dr. Gupta

reviewed the medical records, Dr. Fox recommended surgery.  However, another doctor, Dr.

Stouffer, concluded that since Plaintiff's symptoms were not to the point of limiting his quality

of life, surgery was not recommended and that Plaintiff should continue with conservative care

efforts.[158]  Thus, Dr. Gupta's opinions are not necessarily inconsistent with the record evidence

produced after he issued his opinion.  Further, it is the ALJ's duty to resolve the factual disputes

in the record in determining whether Plaintiff is disabled, which he clearly did.

## IV.  CONCLUSION

Having made a thorough review of the entire record, the Court hereby AFFIRMS the

decision below.

DATED this 30th day of April, 2020.

BY THE COURT:

Paul Kohler
United States Magistrate Judge

---

[158] R. at 846.

21